FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

2017 AUG 14 P 2: 47

CLERK'S OFFICE
AT GREENBELT

BY_____ DEPUTY

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
*Southern Division*

MICHAEL ADAMS,

    Petitioner,

v.      Civil Action No. GJH-16-1934

RICHARD GRAHAM, *et al.*,

    Respondents.

\* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

Michael Adams ("Adams" or "Petitioner") who is self-represented, filed this timely petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254, attacking his 2009 convictions in the Circuit Court for Montgomery County, Maryland for first-degree murder and use of a handgun. ECF No. 1. Respondents, the Warden of Western Correctional Institution where Petitioner is confined and the Attorney General of the State of Maryland, filed an Answer, ECF No. 11, to which Petitioner has replied. ECF No. 14.¹ Having reviewed the parties' submissions, the court finds no need for an evidentiary hearing. *See* Rule 8(a), *Rules Governing Section 2254 Cases in the United States District Courts* and Loc. R. 105.6 (D. Md. 2016); *see also Fisher v. Lee*, 215 F. 3d 438, 455 (4th Cir. 2000) (petitioner not entitled to a hearing under 28 U.S.C. §2254(e)(2)). However, for the following reasons, the Court shall require supplemental briefing by the Respondents.

---

¹ Petitioner believed his Reply, captioned as a "Traverse," had not been received, and resubmitted the document, which is docketed as ECF No. 15. The two documents are identical.

I. **BACKGROUND**

   A. **Jury Trial**

In November of 2008, Petitioner was tried by a jury sitting in the Circuit Court for Montgomery County. *See* ECF No. 11-1 at 32–38. As outlined by the Court of Special Appeals of Maryland, ECF No. 11-5 at 2–12, the relevant facts were presented at trial:

> [A]t approximately 10:00 p.m., on February 8, 2008, one man shot another in or near the 300 block of King Farm Boulevard in Montgomery County.
>
> Witnesses reported the following sequence of events.
>
> Barry and Barbara Gordon, residents of a townhouse across the street from [Adams'] home at 232 King Farm Boulevard, testified that at about 10:00 p.m., on February 8, 2008, they heard a loud crash outside their house and "voices that were very loud yelling at each other." The Gordons heard one person, who sounded like he was pleading, saying with a tremor in his voice, "You don't have to do this, man." After hearing those words, they heard two sounds that sounded like gunshots.
>
> Upon looking out his window, Barry Gordon saw one person huddled on the ground, with a man in sweat clothes "hovering over" that person. Then, the man in sweat clothes turned and walked back down the sidewalk "in a very casual manner." The man turned, looked back, hesitated for a moment, and then went into the unit at 232 King Farm Boulevard-Adams's residence-where Mr. Gordon saw him pacing inside. . . .
>
> Montgomery County Police Officer Antonio Copeland and two other officers were dispatched to the shooting. When they arrived at the scene, Copeland observed a man lying on his side with blood coming out of his mouth. Copeland rolled the victim over to look for entrance/exit wounds and found an entrance wound on the man's lower back. What appeared to be a small caliber bullet fell out from the area of the entrance wound. Copeland attempted to perform CPR on the victim but was unsuccessful.
>
> [T]he victim, identified as Jason Hadeed . . . was pronounced dead at Shady Grove Hospital just after 11:00 p.m. on February 8, 2008. . . .
>
> Montgomery County Police Department Forensic Specialist Gary Arter responded to the crime scene later that night to collect evidence. When he arrived at 232 King Farm Boulevard, he observed that the front door was locked and showed no signs of forced entry or kick marks. Upon entering the home, he saw nothing in

disarray . . . In the master bedroom, Arter found a handgun case and live ammunition on the night stand.

Arter collected the projectile of the fired bullet Officer Copeland had found on Jason's body as well as a live round of ammunition found on the steps of Adams's residence. . . . Forensic Specialist Chere Balma also located a second live round of ammunition on a carpet runner inside the home . . .

. . . On the evening of the shooting, Adams's mother, Dody Pierce, and her live-in "good friend," Edward Heidecker, were in their Vienna, Virginia home. At approximately 11:00 p.m., Heidecker went downstairs to find Adams and his mother talking in the dining room. Adams told Pierce and Heidecker that someone named Jason Hadeed had barged into his condo, used language so vile it could not be repeated in front of his mother, and hit him. Adams also said that Jason had attempted to take his laptop computer and other of his "stuff."

Adams was physically unharmed but was in an apparent state of terror. He stated that he had shot Jason, and the gun he had used was in his car. Between roughly 11:30 and 11:45 p.m., Heidecker and Pierce called the police to advise that Adams had been involved in a shooting. When the police arrived, Adams turned himself in and was taken into custody without incident. . . .

Steven Hadeed, Jason Hadeed's uncle and friend, stated that his nephew, a personal trainer who conditioned athletes for sports, had introduced him to Adams, a former golfer. He and his nephew had invested in Adams's company, Adams Edge Consulting, which involved sports handicapping and gambling. For the first few months, Steven Hadeed received regular investment statements from the company but eventually the statements ceased. . . .

When Jason became aware that Adams had no money to return to his investors, Jason told [Adams] that a group of investors planned to go to the police. . . .

After the State rested its case, Adams moved for judgment of acquittal on the count of first degree murder, as no evidence of premeditation had been shown, and on the use of a handgun in a crime of violence count, arguing that there was no evidence that Adams, specifically, had committed any crime of violence. The court denied the motion.

In his case in chief, Adams did not dispute that it was he who had shot Jason. He proceeded on a theory of self-defense. Dody Pierce testified that in 2007, aware that her son's business was failing, . . . [she] loaned him $30,000, as she knew that his clients were pressing Adams for the return of their lost money. In December 2007, she met with Jason, at his request, whereupon Jason advised her that her son owed him money, that he wanted the return of his money, that her son needed to get a job to pay his investors back, and that "[Jason] knew people that could hurt people."

3

After that meeting, Adams spent more time at Pierce's house in Virginia because he said he was afraid. On January 10, 2008, Adams's cell phone rang all day long; he said it was Jason calling. With Adams getting increasingly upset about the calls and with his mental condition deteriorating, Pierce accompanied Adams to the Woodburn Center, a mental health center that handles "people with depressions and addictions." . . .

Adams made periodic efforts to repay Jason, but he asked Jason not to tell his other investors of his financial problems. . . . Eventually, when appellant was no longer able to repay even Jason, he decided to alert his other investors of the problems with his business, a decision that displeased Jason. Adams said that once Jason was no longer receiving money from him, Jason would "cuss and yell" at him, and he told Adams he would take appellant's TV in lieu of $1,000 owed. Jason became increasingly upset and demanded more of Adams's personal property. . . .

On the morning of February 8, 2008, Adams testified that Jason knocked on his door, but when he did not answer, Jason left a voice mail message and a text message, in rapid succession, that indicated his anger. At around 10:00 p.m., Adams heard another knock on his door, and, thinking it was his upstairs neighbor, . . . answered the door. Instead, it was Jason, who forced his way in and told Adams he was a "slime bucket" and the "scum of the earth" and used "a lot of cuss words." Then, Jason hit Adams twice in the stomach and threatened to "beat the shit out of [him]" and kill him.

While Adams was recovering his breath, he saw Jason wrapping the cord around his laptop as if to take it. Adams demanded the return of his laptop whereupon Jason elbowed him in the stomach. Adams wanted Jason out of his house, so while Jason was rummaging through his things, Adams retrieved a "small pistol" from a kitchen drawer.

He turned to Jason and said, "Get the fuck out of my house," while holding the gun in his hand. Noticing the gun, Jason "came at" Adams and Adams "reacted" by firing the gun. Because Jason was still moving around, Adams did not think he had been hit.

"Somehow," the two exited Adams's house, and while on the front porch, Jason came at Adams again, and Adams reacted again, firing the gun two more times. Jason then started moving down the street but soon fell. . . .

. . . Adams went to Jason but then returned to his apartment. He looked out his window and saw that someone was helping Jason. Not knowing Jason's condition or what to do, [Adams] decided to go to his mother's house. . . .

On cross-examination, Adams admitted that after the gun went off inside his apartment, he and Jason went outside together, but that Jason exited the house

4

> first. . . . Adams conceded that he could have closed the front door, called 911, gone upstairs to hide, or gone into the garage and driven away. Instead, he fired the gun at Jason again, even after it had jammed. Adams admitted that he failed to call 911 or to render any medical assistance to Jason. He characterized the shooting episode as him being scared of [Jason] and defending himself[,] and that he just wanted Jason to leave his home.
>
> After the defense rested, Adams renewed his motion for judgment of acquittal on the ground that the State had shown no premeditation. The court again denied the motion. . . .

ECF No. 11-5 at 2–12. Based on the evidence adduced at trial, the jury convicted Adams of first degree murder and unlawful use of a handgun. *See* ECF No. 11-1 at 38; ECF No. 1-4 at 2. On January 30, 2009, Adams was sentenced by the court to life imprisonment plus a consecutive ten years. *See* ECF No. 11-1 at 40; ECF No. 1 at 1.

### B. Direct Appeal

On appeal to the Maryland Court of Special Appeals, Adams, through counsel, challenged his conviction claiming the trial court erred: (1) by not permitting Adams to establish Jason Hadeed's reputation for violence, and (2) by not permitting testimony that was consistent with and would have bolstered the defense theory of the case. ECF No. 11-5 at 2. In an unreported opinion filed on January 6, 2011, the Court of Special Appeals affirmed Adams' convictions. *Id.* Adams subsequently filed a petition for a *writ of certiorari* requesting that the Court of Appeals of Maryland further review his case. ECF No. 11-6 at 2–17. The writ was denied on May 23, 2011.[2] *Id.* at 18.

---

[2] Petitioner did not seek further review in the Supreme Court. Accordingly, his judgment of conviction became final for direct appeal purposes on August 21, 2011, when the time for seeking review in the Supreme Court expired. *See* Sup. Ct. Rule 13.1 (requiring petition for a writ of certiorari to be filed within 90 days of date of judgment from which review is sought).

## C. Petition for Post-Conviction Relief and Application for Leave to Appeal

On February 29, 2012, Petitioner filed a petition for post-conviction relief in the Circuit Court for Montgomery County. ECF No. 1 at 3; ECF No. 11-1 at 44. This petition was withdrawn on January 29, 2014. ECF No. 11-1 at 47. A subsequent petition was filed on April 3, 2014. *Id.* As supplemented, litigated, and construed by the court without objection, the petition alleged, *inter alia,* that the trial court erred by allowing the jury on several occasions during the course of the trial, but particularly during the hours-long discussion of instructions, to remain in the hallway outside the courtroom where members of the decedent Jason Hadeed's family and friends were located, thus denying Adams his right to due process. ECF No. 1-4 at 10.[3]

At the post-conviction hearing, Adams also asserted, for the first time, additional claims of ineffective assistance of trial and appellate counsel related to the trial court error in allowing the jury to remain in the hallway with Hadeed's family. ECF No. 1-4 at 12. By opinion and order filed on August 25, 2015, the court granted Adams the right to file a belated motion for reconsideration, but otherwise denied post-conviction relief. ECF No. 1-4 at 2.

Adams then sought leave to appeal that adverse decision to the Court of Special Appeals, raising only the claim that the trial court erred in permitting the jurors to remain in the hallway, thus denying Adams his right to due process and an impartial jury. ECF No. 11-7 at 6. In an unreported, per curiam opinion filed on March 18, 2016, the intermediate appellate court declined to review the case. ECF No. 1-5 at 2.

## D. Federal Habeas Petition

In Petitioner's instant § 2254 petition, he claims that trial and appellate counsel were ineffective for failing to argue that the trial court abused its discretion by failing to *voir dire* the

---

[3] Trial counsel brought to the trial court's attention that "[a]pparently, during the break, in the presence of the jury, the Hadeed family is out there, talking about how the Court has now made it okay for somebody to shoot somebody in their own home." *See* ECF No. 1-4 at 10.

6

jury to determine what they heard, and whether they could remain impartial after spending hours in the courthouse hallway with Hadeed's family. ECF No. 1 at 5.

## II. STANDARD OF REVIEW

An application for writ of habeas corpus may be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a). The federal habeas statute at 28 U.S.C. § 2254 sets forth a "highly deferential standard for evaluating state-court rulings." *Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997); *see also Bell v. Cone*, 543 U.S. 447 (2005). The standard is "difficult to meet," and requires courts to give state-court decisions the benefit of the doubt. *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (internal quotation marks and citations omitted); *see also White v Woodall*, 134 S. Ct 1697, 1702 (2014) (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011) (state prisoner must show state court ruling on claim presented in federal court was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair minded disagreement")).

A federal court may not grant a writ of habeas corpus unless the state's adjudication on the merits: 1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or 2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254 (d). A state adjudication is contrary to clearly established federal law under § 2254(d)(1) where the state court 1) "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law," or 2) "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [the Supreme Court]." *Williams v. Taylor*, 529 U.S. 362, 405 (2000).

7

## III. DISCUSSION

Before applying this standard, the Court must first determine whether each claim is cognizable for federal review and, if deemed cognizable, whether the claim has been fully presented for adjudication in the state courts. The ineffective assistance claim as presented is couched as a denial of due process and arguably is cognizable. Petitioner, however, fails to meet the second threshold as to his ineffective assistance of counsel claim. Because he did not raise it when seeking leave to appeal the denial of post-conviction relief, the claim is unexhausted and procedurally defaulted. Nonetheless, this court will examine that portion of the due process claim that has been fully presented for litigation, namely, whether Petitioner was prejudiced by trial court error emanating from the Montgomery County practice of allowing jurors to remain in the hallway outside the courtroom, where jurors could be exposed to comments made by the public, including the victim's family and friends.

A criminal defendant's right to have an impartial jury trial is one of the most fundamental rights under the United States Constitution. *See Strickland v. Washington*, 466 U.S. 668, 685 (1984).[4] In criminal trials, well-entrenched Supreme Court authority "absolutely" forbids "external causes tending to disturb the [jury's] exercise of deliberate and unbiased judgment . . . at least until their harmlessness is made to appear." *Mattox v. United States*, 146 U.S. 140, 149–50 (1892) (cited in *Near v. Cunningham*, 313 F.2d 929, 933 (4th Cir. 1963)).

Established federal law further provides that any unauthorized "private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial," *Remmer v. United*

---

[4] This right is also well defined under Maryland law. "The potency of the Sixth Amendment right to a fair trial relies on the promise that a defendant's fate will be determined by an impartial fact finder who depends solely on the evidence and argument introduced in open court." *Wright v. State*, 131 Md.App. 243, 253 (2000) (quoting *Allen v. State*, 89 Md. App. 25, 42 (1991)).

8

*States*, 347 U.S. 227, 229 (1954), and also compels a criminal trial court to consider the prejudicial effect of *any* external contact that has a "tendency" to influence the verdict, irrespective of whether it is about the matter pending before the jury. *Mattox*, 146 U.S. at 150–51. Moreover, such contact need not amount to a "communication" to trigger judicial inquiry into possible prejudice. *See Smith v. Phillips*, 455 U.S. 209, 212–15 (1982) (requiring judicial inquiry into possible prejudice arising from a juror's job application in the office of the prosecutor trying the case); *Mattox*, 146 U.S. at 150 (recognizing the prejudicial potential of reading newspapers). The potential for extraneous influence also has been identified in cases where members of a jury overheard the bailiff make disparaging comments about the defendant. *Parker v. Gladden*, 385 U.S. 363, 365 (1966). However, Respondents have not provided the post-conviction transcript where the question of error was argued, nor have they briefed the issue on its merits.

## IV. CONCLUSION

For these reasons, within 30 days, Respondents shall supplement their Answer and include a post-conviction hearing transcript and any other relevant exhibits. A separate Order follows.

Date: August 14, 2017

GEORGE J. HAZEL
United States District Judge